UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/4/2019

In re: MPM SILICONES, L.L.C.,

Debtor,

BOKF, NA, IN ITS CAPACITY AS TRUSTEE, *et al.*,

Plaintiff-Appellants,

-against-

WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as trustee, *et al.*,

Defendants-Appellees.

WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as trustee,

Plaintiff-Appellants,

-against-

WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as trustee, *et al.*,

Defendants-Appellees.

15-cv-2280 (NSR)

<u>AMENDED</u>
<u>OPINION & ORDER</u>

NELSON S. ROMÁN, United States District Judge

This appeal arises from the United States Bankruptcy Court for the Southern District of New York (Robert D. Drain, B.J.). It pertains to the Bankruptcy Court's granting Appellees' Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c), and it raises five principal questions. The first regards whether the Bankruptcy Court erred in finding, as a matter of law, that the Appellees did not breach the Intercreditor Agreement ("ICA"), a contract governed by New York law, by voting in favor of MPM's reorganization plan that Appellants opposed. The next three concern whether the Bankruptcy Court erred in finding, as a matter of law, that the Appellants failed to raise a plausible claim for breach of the ICA with regards to three actions: (1) Appellees' receiving equity in reorganized stock in exchange for releasing their claims on certain collateral that Appellees and Appellants shared; (2) Appellees' receiving and retaining a certain "BCA Fee" prior to Appellants receiving a payment in full cash for their liened securities; and (3) Appellees' receiving payment of their professional fees prior to the Appellants receiving a payment in full cash for their liened securities. The fifth question is whether the Bankruptcy Court erred in dismissing, as a matter of law, Appellants' alternative claim for breach of the covenant of good faith and fair dealing.

The Court has reviewed the parties' briefs, exhibits incorporated into the complaint by reference, the Bankruptcy Court's Order Granting Defendants' Motion to Dismiss and Motion for Judgment on The Pleadings, entered on October 15, 2014 ("First Order"),[1] and the Bankruptcy Court's Subsequent Orders Denying Plaintiff's Motion for Leave to File an Amended Complaint,

---

[1] Corrected and Modified Bench Ruling on Defendants' Motions to Dismiss Pursuant to Fed. R. Bankr. P. 7012, *In re MPM Silicones LLC* (Bankr. S.D.N.Y. Oct. 15, 2014).

entered on January 29, 2015 ("Second Order")[2] and on May 14, 2015 ("Third Order").[3] For the reasons set forth in the Bankruptcy Court's well-reasoned Orders and additional reasons that this Court relays below, this Court AFFIRMS the Bankruptcy Court's Orders in their entirety.

## BACKGROUND

This Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law *de novo*. *Johnson v. Rowley,* 569 F.3d 40, 43-44 (2d Cir. 2009). The ensuing facts derive from the First Amended Complaint ("FAC"), the Bankruptcy Court's three Orders, as well as the parties' appellate briefs. They are undisputed unless otherwise noted.[4]

### I. The Parties

Appellants are indenture trustees for two groups of lenders – the First Lien Noteholders[5] and the 1.5 Lien Noteholders[6] (collectively, "Senior Noteholders," or "Seniors"). Plaintiff BOFK, N.A. ("BOFK") became the agent for the First Lien Noteholders under the First Lien Note Indenture, replacing The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") on June 17, 2014. It is a party to the ICA and represents the interests of the First Lien Noteholders.

---

[2] Order Denying Plaintiff's Motion for Leave to File an Amended Complaint, *In re MPM Silicones LLC* (Bankr. S.D.N.Y. Jan. 29, 2015).

[3] Order Denying Plaintiff's Motion for Leave to File an Amended Complaint, *In re MPM Silicones LLC* (Bankr. S.D.N.Y. May 14, 2015).

[4] Because Appellants' FAC references several extrinsic agreements, the Court may properly consider those documents along with the pleadings. Such documents "cannot be contradicted by Appellants' allegations." *In re Musicland Holding Corp.*, 374 B.R. 113, 120 (S.D.N.Y. Bank. 2007). Where they are, the Court need not accept Appellants' allegations as true.

[5] The "First Lien Noteholders" are the holders of $1,100,000,000 in aggregate principal amount of 8.875% First-Priority Senior Secured Notes due 2020.

[6] The "1.5 Lien Noteholders" are the holders of $250,000,000 in aggregate principal amount of 10% Senior Secured Notes due 2020.

Appellees are the Second Lien Noteholders (the "Seconds").[7] Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is the intercreditor agent under the ICA, as of November 16, 2012. Defendant Wilmington Savings Fund Society, FSB ("WSFS") became the successor trustee or substitute agent under the Indenture as of November 5, 2010. It represents the interest of the Second Lien Noteholders.

MPM Silicones L.L.P.'s ("MPM") and its affiliates manufacture silicone, silicone-based derivatives, quartz, ceramics, and other specialty materials for industrial applications. MPM and its affiliate Momentive Specialty Chemicals, Inc., were formed in 2006 by the sale of the General Electric Advanced Materials Business to Apollo Global Management, LLC, as part of a $3.8 billion leveraged buyout. In connection with Apollo's leveraged acquisition, MPM issued more than $3 billion of debt. For years, MPM has struggled to make payments on its debts. As of December 31, 2013, MPM consolidated $4.1 billion in outstanding debt.

## II.   MPM's Debt Structure

MPM's debt was issued across four tranches. Three tranches of debt were *secured senior debt*. Amongst these, the first secured lien (issued to the First Lien Noteholders) was a loan of $1.1 billion. The second secured lien (issued to the 1.5 lien Noteholders) was a loan of $250 million. The third secured lien (issued to the Second Lien Noteholders) was a loan of $1.35 billion. The final tranche of MPM debt was *unsecured* subordinated debt (issued to the Senior Subordinated Noteholders ("SubNoteholders")) for $382 million. The three tranches of *secured senior* debt are similar in that they all have the same payment priority (that is, they are entitled to be paid at the same time, and none must defer receiving payment until another has been paid in full.) Those

---

[7] The Second Lien Noteholders are the holders of (a) the $1,160,687,000 in aggregate principal amount of 9.0% Second Priority Lien Notes due 2021 and (b) the €150,000,000 in aggregate principal amount of 9.5% Second Priority Springing Lien Notes due 2021, who are named as defendants in the complaints.

tranches differ, however, in their access to the shared property that MPM has pledged to secure its obligations to these creditors ("Common Collateral") to satisfy their debts.

Generally speaking, the First Lien Noteholders have first priority. Neither the 1.5 nor the Second Lien Noteholders may exercise remedies as secured lenders to reach the Common Collateral or its proceeds before the First Lien Noteholders are paid in full. The 1.5 Lien Noteholders may exercise remedies next, and the Second Lien Noteholders may not exercise remedies as secured lenders to reach the Common Collateral until the 1.5 Lien Noteholders, too, are paid in full. The SubNoteholders have no security interest in the Common Collateral.

## III.     Fulcrum Security Holders

As the Second Circuit explained in its related decision, *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 794 (2d Cir. 2017), *cert. denied sub nom. BOKF, N.A. v. Momentive Performance Materials, Inc.*, 138 S. Ct. 2653 (2018), *and cert. denied sub nom. Wilmington Tr., N.A. v. Momentive Performance Materials, Inc.*, 138 S. Ct. 2653 (2018), there is a more elaborate relationship between the parties that support MPM's third and fourth tranches of debt—that is, between the SubNoteholders and the Seconds. In 2006, MPM issued $500 million in subordinated *unsecured* notes pursuant to a 2006 Indenture. In 2009, MPM issued *secured* second-lien notes and offered the then SubNoteholders the option to exchange their unsecured notes for the newly-issued second-lien notes. The second-lien notes were offered at a 60% discount, but were at least secured. Consequently, holders of $118 million of the $500 million accepted the offer, leaving $382 million in *unsecured* notes outstanding (this is how the fourth tranche of unsecured $382 million affiliated with SubNoteholders came to be).

Subsequently, in 2010, MPM issued approximately $1 billion in "springing" lien notes. These were to be *unsecured* until the $118 million of previously exchanged subordinated notes

were redeemed at which point the "spring" in the lien would be triggered. Once triggered, the purchasers of the springing-lien notes would obtain a second-lien *security* interest in the Debtor's collateral. The exchanged subordinated notes were redeemed in November 2012, at which point the trigger occurred and the Seconds came to own a security interest in over $1 billion in second-priority liens on MPM's Common Collateral. But although the Seconds became secured as junior lienholders, they soon became *massively undersecured*, leading them to take on the practical status of "fulcrum security holders" in MPM's debt structure. Fulcrum security holders are otherwise secured creditors who, based on the debtor's assumed enterprise values, would be unable to receive a full recovery for their unsecured liens in cash. Therefore, they often seek other forms of consideration and are well-positioned to influence restructurings.[8]

In MPM's case, once it became apparent that MPM would be filing its petition, it was calculated the Seconds were the fulcrum securities holders because after the Seniors' claims would be satisfied, the remaining Common Collateral would be so small that $1 billion of the Seconds' secured loans could not ostensibly be paid from MPM's assets. Although Appellants dispute how important the Seconds' status is as holders of fulcrum securities, their position as such is undisputed. Due to their status as holders of fulcrum securities, the Bankruptcy Court frequently referred to the Seconds as wearing "two hats" – a secured and unsecured hat.

---

[8]

       Fulcrum Security "is the term used to describe those debt securities within a given capital structure that, based on the assumed enterprise values, would not be entitled to receive a full recovery in cash, thereby making it rational for holders to consider other forms of consideration such as a debt for equity exchange. In effect, holders of fulcrum securities are at the tipping point of the capital structure (neither entirely in nor out of the money) and given their impairment and entitlement to vote for or against a chapter 11 plan are in a position to have considerable influence over the outcome of a restructuring.

*In re Charter Communications*, 419 B.R. 221, 233 n.6 (S.D.N.Y. 2009).

## IV.  The Agreements

### A.  Indenture Agreements

An indenture dated November 5, 2010 reflects that Second-Priority Secured Parties are holders of MPM debt. Pursuant to this Indenture, two types of bonds were issued: (a) the initial $1,160,687,000 in aggregate principal amount of 9.0% Second Priority Lien Notes due 2021 and (b) the initial €150,000,000 in aggregate principal amount of 9.5% Second Priority Springing Lien Notes due 2021 (collectively, the "Second Lien Notes"). These obligations are secured.

A second indenture, dated October 25, 2012 and supplemented by the Supplemental Indenture dated November 16, 2012, reflects that the First Lien Lenders' are also holders of MPM debt, holding it under First-Priority Senior Secured Notes ("First Lien Notes"), pursuant to which $1,100,000,000 in aggregate principal amount of 8.875% are due in 2020.

### B.  Intercreditor Agreement

The ICA is a contract that binds MPM's secured creditors. The ICA came into effect on November 16, 2012 with BNY Mellon serving as the trustee for all noteholders and JPMCP serving as the intercreditor agent and senior priority agent. The ICA governs MPM's secured creditors' rights and obligations to each other. Specifically, the ICA sets forth the priorities, rights, and remedies of the Seniors and Seconds with respect to the Common Collateral. The ICA firmly establishes the priority of liens on the Collateral and focuses on the circumstance that MPM is unable or unwilling to repay its debts.

The ICA has several provisions that are key to this suit. The first is Section 2, which establishes that the Seniors' liens have complete priority over the Seconds' liens with respect to the Common Collateral. Next is Section 3, which deals with the Seniors' exercise of remedies. While the parties dispute how to interpret Section 3, broadly speaking, Section 3 prohibits lower

priority Noteholders from taking any actions that "hinder" the Senior Noteholders' ability to "exercise remedies" with respect to the Common Collateral. This Section also provides that the Seconds will not take or receive any part of the Common Collateral, including its *proceeds*, until the Seniors' claims are fully discharged.

Section 4 contains an important "turnover" provision, which provides that if subordinate noteholders receive Common Collateral or its proceeds prior to the Seniors' claims being discharged, the subordinate Noteholders must hold such proceeds in trust and pay them to the Seniors. Section 5 then lays out the broad rights and benefits that *unsecured* creditors have. Lastly, Section 6 focuses specifically on insolvency and liquidation issues. For example, it focuses on the Seniors' and Seconds' rights to object to requests for adequate protection and alternate financing.

### C. Chapter 11, RSA and BCA Agreements

On April 13, 2014, MPM filed a series of related Chapter 11 bankruptcy cases captioned *In re MPM Silicones, LLC, et al.*, Case No. 14-22503 (RDD). The Chapter 11 plan included all tranches of creditors, including: First Lien Noteholders, 1.5 Lien Noteholders, Second Lien Noteholders, Senior SubNoteholders, and Payment-in-Kind Noteholders. Pertinent to this suit, the plan gave Seniors the options to either: 1) accept the plan immediately and receive a cash payment of the outstanding principal and interest due on their Notes, without a "make-whole"[9] premium, or ii) reject the Plan and receive replacement notes "with a present value equal to the Allowed amount of such holder's [claim]," and then litigate any lingering issues, such as whether they were entitled to the make-whole premium and the interest on the replacement notes. Additionally, the plan

---

[9] "A make-whole premium is a contractual substitute for interest lost on Notes redeemed before their expected due date . . . . [I]ts purpose is to ensure that the lender is compensated for being paid earlier than the original maturity of the loan for the interest it will not receive . . . ." *In re MPM Silicones, LLC*, 874 F.3d 787, 801 n.13 (2d Cir. 2017) (internal quotations omitted).

included a "deathtrap"[10] provision whereby Senior Noteholders who voted to reject the plan would instead receive replacement secured notes in a principal amount equal to its allowed secured claims. The interest rate for the replacement notes was to be set by MPM at a present value it considered sufficient to satisfy the "cramdown"[11] requirements of Bankruptcy Code Section 1129(b)(2)(A). Subsequently, the Seniors voted to reject the plan,[12] and the Seconds voted in favor of it.[13]

On April 14, 2014, before the Bankruptcy Court confirmed MPM's Chapter 11 plan, MPM entered into a Restructuring Support Agreement ("RSA") with the Ad Hoc Committee of Second Lien Noteholders ("AHC") and Apollo (who, together, constituted the majority of the Seconds). Under the RSA, AHC and Apollo agreed to support MPM's Chapter 11 Plan with certain key elements. For example, MPM represented that it planned to raise the cash to fund its Plan – $600 million of new capital – through a rights offering that would allow subscribers to purchase Reorganized MPM Stock. The RSA contemplated that the Seconds would guarantee the success of the rights offering. The Seconds purported to do this by entering into the "Backstop Commitment Agreement" ("BCA") on May 9, 2014, thereby agreeing to purchase pro rata any

---

[10] "A 'death-trap' provision is a coercive provision that seeks to encourage claimants to vote in favor of a plan with promises—in return for a favorable vote—of treasure and/or favorable treatment. Should the claimants vote against the plan, the claimants will receive less or no treasure and/or is otherwise penalized." Douglas E. Deutsch., *Chapter 11 Plan Confirmation Issues: Settlements, Releases, Gifting and Death Traps*, 29-OCT Am. Bankr. Inst. J. 54, 91 (2010).

[11] In a "cramdown," a bankruptcy court involuntarily imposes a reorganization plan on a class of creditors that voted to reject the same plan. *See In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39, 42 (2d Cir. 1998). Under Bankruptcy Code Section 1129(b)(1), a bankruptcy court may confirm a plan with cramdown provisions so long as it does not "discriminate unfairly" and is "fair and equitable" with regards to each rejecting class. 11 U.S.C. 1129(b)(1).

[12] The Seniors opposed the Plan on the ground that the replacement notes they received did not provide for the make-whole premium and carried a largely risk-free interest rate that failed to comply with the Code because it was well below ascertainable market rates for similar debt obligations and thus was not fair and equitable, as required under the Bankruptcy Code, because it failed to give them the present value of their claim.

[13] The Subordinated Notes holders (*i.e.* unsecured creditors) opposed the plan as well. While under the Plan, they would receive nothing, they contended that their Notes were not subordinate to the Second-Lien Notes holders, and consequently, they were entitled to some recovery.

unsubscribed Reorganized MPM Stock. As such, entrance into the RSA was a condition precedent for the Seconds' entrance into the BCA, which then backstopped the rights offering. Notably, the agreements were ratified on different dates, contained different termination provisions, and different parties participated in each.

After several months of negotiations, on August 26, 2014, Judge Drain held a multi-day confirmation hearing and issued a bench ruling in which he confirmed MPM's revised Chapter 11 Plan. The approved Plan provided that MPM's First Lien notes and 1.5 Lien Notes, with estimated claims totaling $1.1 billion and $250 million respectively, were to be paid in full, in cash, but without payment of any make-whole premiums and provided the aforementioned "deathtrap" provisions applied in the event the Seniors voted to reject the Plan. As to the Second Lien Notes, the Plan provided that they would receive the equity value of the Debtor's assets through the grant of reorganized MPM's new common stock (the "Common Stock") in two tranches: the "Direct Distribution Shares" received for the cancellation of their Notes; and the "Subscription Rights," through which they would participate in a separate rights offering. Certain Second Lien Noteholders also received: (1) a $30 million fee for entering into the BCA, which again backstopped the rights offering, and (2) professional fees pursuant to the RSA and/or BCA.

Despite the Seniors' persistent objections, on May 4, 2015, Judge Bricetti of the Southern District of New York affirmed the Bankruptcy Court's approval of MPM's Plan. *See In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015). The Seniors then appealed that order to the Second Circuit. On October 20, 2017, the Second Circuit issued its ruling, affirming the legal validity of the Chapter 11 Plan, with a single exception that was remanded. *See In re MPM Silicones, L.L.C.*, 874 F.3d 787 (2nd Cir 2017). ("With one exception, we conclude that the plan confirmed by the bankruptcy court and affirmed

by the district court comports with the provisions of Chapter 11. We remand so that the bankruptcy court can address the single deficiency we identify with the proceedings below which is the process for determining the proper interest rate under the cramdown provision of Chapter 11.")

## V. Procedural History to the Present Appeal

The issues predicating this case commenced with the First Lien Noteholders filing their original complaint in Supreme Court of the State of New York on June 18, 2014. (*See* Complaint, A.19-A.41.) On July 2, the First Lien Noteholders filed their First Amended Complaint ("FAC"). On July 8, the case was removed to the Southern District of New York. (*See* Notice of Removal, A.8-A.17.) On July 16, 2014, the case was automatically referred to the Southern District of New York in White Plains. (*See* Amended Standing Order of Reference, A.8.) On July 16, the 1.5 Lien Noteholders filed their complaint in the Supreme Court State of New York and on July 23, the case was removed to the Southern District of New York and referred to the Bankruptcy Court for the Southern District of New York (*See* Notice of Removal A.1523-68.) On July 25, the Appellees answered the complaint, and on August 15, 2014, Appellees filed their Motion to Dismiss and Motion for Judgment on the Pleadings. (*See* "Motion to Dismiss," A183-A.231; A.1583-A.1631.)

On October 14, 2014, Judge Drain issued a Bench Ruling on Appellees' Motion to Dismiss, which he modified and re-issued on October 15, 2014. (*See* First Order.) The First Order granted Appellees' Motions to Dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c). Specifically, Judge Drain dismissed certain of Appellants' claims alleging breaches or threatened breaches of the ICA, *without prejudice*. (*See* Order, A.309-A.344.) The First Order also dismissed *with prejudice* all remaining claims alleged in the FAC, including Appellees': (1) alleged breach of the ICA from intervening in the Optional Redemption Litigations (FAC ¶¶ 9, 33, 35); (2) alleged breach of the ICA by entering into the RSA and otherwise supporting the MPM's Chapter 11 Plan

(FAC ¶¶ 9, 33, 38-41); (3) alleged breach of the ICA by receiving proceeds of Common Collateral in the form of a $30 million charge or fee  (FAC ¶¶ 9, 44); (4) alleged breach of the ICA by receiving proceeds of Common Collateral in the form of new equity as distributions of the Plan, (FAC ¶¶ 42, 72-73); and (5) alleged violation of their common law duty of good faith and fair dealing. (*See* Order, A.309-A.344.) Judge Drain also granted Appellants leave to amend their FAC.

On November 14, 2014, Appellants timely filed their Motion for Leave to file a Second Amended Complaint for Breach of Contract. ("Proposed SAC") (*See* A.533-A.655.) On January 29, 2015, following another hearing, Judge Drain issued an Order Denying Appellants Leave to file the Proposed SAC, holding that it would be futile. (*See* Second Order, A.852-A.854.) On March 2, 2015, the First Lien Noteholders belatedly filed their Motion for Leave to file a Third Amended Complaint for Breach of Contract. ("Proposed TAC") (*See* A.879-A.994.) On May 14, 2015, following yet another hearing, Judge Drain once again issued an Order Denying Appellants Leave to file the Proposed TAC on the basis that it would be futile. (*See* Third Order, A.1238-A.1329.)

Throughout these proceedings, Judge Drain relied heavily on the standards set out in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), finding that most permutations of Appellants' pleadings were far too conclusory for the Seniors to adequately allege that the Seconds breached various provisions of the ICA. For several claims, he explained that because the Seconds were holders of fulcrum securities (and therefore secured *and* unsecured creditors), their actions did not violate the ICA as a matter of law.

Subsequently, on May 27, 2015, Appellants filed their Notice of Appeal, leading to the review that is presently before this Court.[14] (*See* Notice of Appeal, A.1399-A.1502.) Again, the issues on appeal do not regard the validity of MPM's Chapter 11 Plan, which has already been adjudicated. The issues on this appeal pertain to a cluster of supposed breaches of the ICA by the Seconds, which the Bankruptcy Court has repeatedly dismissed on the pleadings.

## VI.    Issues on Appeal

The issues on appeal fall into three general categories. The first category pertains to the issue of whether the Bankruptcy Court erred in finding, as a matter of law, that the Appellees did not breach the ICA by voting in favor of MPM's Reorganization Plan, which the Seniors opposed. This claim will hereinafter be deemed the "Interference Claim."

The second category pertains to the following three claims: (1) whether the Bankruptcy Court erred in finding, as a matter of law, that Appellees did not breach the ICA by receiving equity in reorganized MPM stock in exchange for releasing their claims, liens, and restrictions on the Common Collateral prior to the Senior Lenders receiving payment in full cash; (2) whether the bankruptcy court erred in finding, as a matter of law, that Appellees did not breach the ICA by receiving and retaining the BCA Fee prior to the Senior Lenders receiving payment in full cash for their liened securities; and (3) whether the Bankruptcy Court erred in finding, as a matter of law, that Appellees did not breach the ICA by receiving payment of their professional fees from MPM's cash collateral prior to the Senior Lenders receiving payment in full cash full cash for their liened securities. These claims will hereinafter be deemed the "Turnover Claims." The final issue is

---

[14] Although the Appeal was filed in March 2015, on March 31, 2015, this Court stayed a briefing schedule for 14 days, pending the entry of an Order from the Bankruptcy Court resolving the First Lien Motion to Amend. (*See* ECF No. 6.) On October 2, 2017, this Court issued an Order again staying all proceedings related to this appeal during the pendency of the MPM Chapter 11 Confirmation Appeal. (*See* ECF No. 40.) On October 20, 2017, the Second Circuit issued its opinion in the MPM Confirmation Appeal, and on December 22, 2017, it terminated its jurisdiction over the MPM Confirmation Appeal and remanded the case to the District Court for further proceedings. (*See* ECF No. 41.) Consequently, on January 31, 2018, this Court lifted the stay that had been pending on the instant appeal. (*See id.*)

whether the Bankruptcy Court erred in dismissing the Appellants' claim for breach of the <u>covenant of good faith and fair dealing</u>. This will hereinafter be deemed the "Quasi-Contract Claim."

**STANDARD OF REVIEW**

### I.     Bankruptcy Appeals

In general, a district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 480 B.R. 468, 473 (S.D.N.Y. 2012). A bankruptcy court's decision on a motion to file a late claim, however, is reviewed only for abuse of discretion. *In re Calpine Corp.*, No. 07-CV-8493 (JGK), 2007 WL 4326738, at *3 (S.D.N.Y. Nov. 21, 2007). The Second Circuit has explained that a bankruptcy court "exceeds its allowable discretion where its decision (1) rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) cannot be located within the range of permissible decisions, even if it is not necessarily the product of a legal error or a clearly erroneous factual finding." *Schwartz v. Geltzer (In re Smith)*, 507 F.3d 64, 73 (2d Cir. 2007). As contract interpretation is generally a matter of law, a bankruptcy court's determinations thereunder are subject to *de novo* review. *United States v. Barrow*, 400 F3d 109, 117 (2d Cir. 2005).

### II.     Motions to Dismiss under 12(b)(6) and 12(c)

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations." *Id*. at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id*. at 662. A court is generally confined to the facts alleged in the complaint for the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6). *Cortec Indus. v. Sum Holding L.P*., 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *Kleinman v. Elan Corp*., 706 F.3d 145, 152 (2d Cir. 2013).

Critically, where "a plaintiff's conclusory allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference . . . , the court is not required to accept them." *In re Musicland Holding Corp.*, 374 B.R. at 119-20. Moreover, in rendering its determination on plausibility, a court should consider: "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). Additionally, a motion pursuant to 12(c) is

analyzed under the same standard as a motion pursuant to 12(b)(6).  *See Altman v. J.C. Christensen & Assoc's, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015).

### III.    Contract Claims Under New York Law

"The primary objective [with respect to contract interpretation] is to give effect to the parties' intent as revealed in the language that they used." *Musicland*, 374 B.R. 113.  "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Matter of Pooling and Serv. Agmts.*, No. 17-CV-1998 (KPF), 2018 WL 1229702, at *6 (S.D.N.Y. Mar. 9, 2018).  Consequently, a threshold issue for any court is "whether the contract is ambiguous", *Great Minds v. Fedex Off. and Print Servs., Inc.*, 886 F.3d 91 (2d Cir. 2018) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.i,* 639 F.3d 63 (2d Cir. 2011)). Such a determination rests on a question of law. *Id.* (citing *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152 (2d Cir. 2016)).

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156.  Ambiguity exists where a contract's "terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110 (2d Cir. 2014)) (internal quotations omitted).  In coming to this conclusion, courts follow "normal rules of contract interpretation: words and phrases should be given their plain meaning *and* a contract should be construed as to give full meaning and effect to all of its provisions." *Id.* (emphasis added) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015) (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003))).

**DISCUSSION**

Appellants argue that the Bankruptcy Court erred in dismissing the Interference, Turnover, and Quasi-Contract claims on the pleadings.  The Court addresses each category in turn.

## I.      Interference Claims

Appellants pleaded that the Seconds breached ICA Section 3.1(c) by entering the RSA and voting to approve the Chapter 11 Plan over the Seniors' objections, and which ultimately paid the Seniors less than payment in full, in cash, of their liened securities. (*See* Appellants Br. at 15, 34-35.) The Bankruptcy Court found no plausible ICA breach resulting from the Seconds' voting in favor of the Plan. This Court agrees with the Bankruptcy Court.

The Court begins by assessing the relevant provisions of the ICA pertinent to this claim. Section 3.1(c) provides that no Second:

> will take any action that would *hinder any exercise of remedies* undertaken by the [Seniors] with respect to the Common Collateral … including any sale, lease, exchange, transfer or other disposition of the Common Collateral, whether by foreclosure or otherwise

ICA § 3.1(c) (emphasis added). It also provides that each Second:

> waives any and all rights it … may have as a junior lien creditor or otherwise to object to the manner in which the [Seniors] seek to enforce or collect the Senior Lender Claims or the Liens granted in any of the Senior Lender Collateral

(*Id*.)  The thrust of Appellants' argument is that the collective conduct in which the Seconds voted to approve the Chapter 11 Plan (to which the Seniors objected and which ultimately provided the Seniors with replacement notes allegedly worth less than their oversecured claims) violated the ICA because it "'hindered' the [Seniors'] exercise of remedies in the manner in which they sought to collect on their claims." (Appellants Br. at 34.) Appellants point to numerous definitions of the word "hinder" and argue that due to the plain meaning of the term, as a pleading matter, the

Seconds' conduct was plausibly a "hindrance" as contemplated by the ICA. (*Id*.) This Court begs to differ.

Again, when interpreting the terms of a contract under New York law, ambiguity is assessed objectively by a reasonably intelligent person who has examined *the context of the entire integrated agreement* and who is cognizant of the customs, practices, usages and terminology as generally understood *in the particular trade or business*.'" *Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir.1998) (emphasis added.)

Hence, even for plausibility purposes, a single contract term cannot be assessed in the isolation of a few out-of-context sentences. The Seniors' Section 3 rights intricately relate to provisions of a fully-integrated document with a specific purpose in a particular trade. Moreover, in a seminal bankruptcy case, the Supreme Court explained:

> Statutory construction … is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in context that makes it meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 108 S. Ct. 626, (1988) (Scalia, J.) (internal citations omitted).

Therefore, this Court takes a holistic view of the ICA. In so doing, it underscores that the Appellees are holders of fulcrum securities and wore both *secured* and *unsecured* hats. Consequently, the Seconds' obligations not to "hinder" the Seniors' exercise of remedies pursuant to Section 3.1(c) are necessarily qualified by Section 5.4, which confers the Seconds broad rights in their concomitant role as *secured* creditors.

ICA Section 5.4 provides:

> *Notwithstanding anything to the contrary* in this Agreement, the [Seconds] may exercise rights and remedies *as an unsecured creditor against the Company* or any subsidiary ....  Nothing in this Agreement shall prohibit the receipt by any … of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by any [Second] of rights or remedies *as a secured creditor* in respect of Common Collateral

ICA § 5.4 (emphasis added).  This language is broad and unambiguous.  As the provision starts with "notwithstanding anything to the contrary in this Agreement", it trumps any other provision of the ICA.  *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 90 (2d Cir. 2002).  Consequently, the Seconds, when acting as *unsecured* creditors, have unfettered reign to act against the Company. The only language that limits the Seconds' rights prohibits them from receiving "interest or principle directly or indirectly as a result of their exercise of "rights or remedies as a *secured* creditor."  ICA § 5.4.

In reconciling the provisions applicable to *secured* versus *unsecured* creditors, Appellants oversimplify the Bankruptcy Court's interpretation of the contract. The Bankruptcy Court did not say that the Seconds could not breach "the ICA if they take actions as secured creditors so long as they could have taken those same actions as unsecured creditors.") (Appellants Br. at 36-37.) Nor does this Court find that Section 5.4's relevance is limited to being an alternative justification for the Seconds' conduct. Rather, this Court finds that a plausible meaning of "hindrance" must accommodate all provisions of the ICA and harmonize the agreement's plain text with the broader context of ICA agreements in bankruptcy litigation. It must also be an interpretation that does not render enforcement of the agreement nonsensical or "produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 1. A.D.3d 170, 171 (1st Dept. 2003) (internal citations omitted).

In that vein, while Section 3.1(c) and 5.4 may seem irreconcilable, their friction is one that can be resolved, as numerous bankruptcy courts throughout this country have already done so. The growing consensus is that agreements that seek to limit or waive junior noteholders' voting rights must contain *express* language to that effect. *See In re Boston Generating LLC,* 440 B.R. 302, 319 (Bankr. S.D.N.Y. 2010) ("If a secured lender seeks to waive its rights to object to a 363 sale, it must be clear *beyond peradventure*.") (emphasis added). This is particularly important under New York Law. *See Golfo v. Kycia Assocs., Inc.*, 45 A.D.3d 531, 845 N.Y.S.2d 122 (2007) ("A waiver is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from silence. Rather there must be proof that there was a voluntary and intentional relinquishment of a known and otherwise enforceable right.") (internal citations and quotation marks omitted.)

Where—as here—there is no express waiver or specific constricting language in the contract, courts are reluctant to read such constraints into broad provisions. For example, in *Boston Generating*, 440 B.R. 302, where there was an intercreditor agreement with very similar language to the ICA, the court found that absent language expressly prohibiting second-lien lenders from objecting to a Section 363 sale, language in the agreement that generally provided first-lien lenders with the "exclusive right" to make determinations regarding the sale of collateral was not specific enough to extend to objections to bidding procedures for the sale.

Similarly, in *In re Dura Automotive Systems, Inc.*, 379 B.R. 257 (Bankr. D. Del. 2007), the court ruled that certain noteholders had a right to be heard with respect to confirmation of the debtor's plan of reorganization, where the "no-action clause" was not crystal clear in its wording. Likewise, in *In re CyberDefender Corp.*, Case No. 12-10633 (Bankr. D. Del. May 2012), the senior and junior lien holders were parties to an intercredtior agreement that contained only broad subordination powers that prevented junior lien holders from interfering with first lien lender's

rights and remedies.[15] When the senior lender sought to credit bid its debt at a Section 363 sale, the junior lien lenders objected, and the senior lender responded that the juniors lacked standing to object due to their agreement. There, too, the bankruptcy judge ultimately upheld the junior lien holders' right to object absent an express voting rights waiver.

Occasionally, courts have even refused to enforce voting rights provisions based on their inherent conflict with the Bankruptcy Code's system of reorganization. For example, *in In re 203 N. LaSalle Street Partnership*, the court refused to enforce the vote-reassignment provision of the intercreditor agreement, finding that it would destabilize the bargaining environment set by the Bankruptcy Code and violate public policy. 246 B.R. 325 (Bankr. N.D. Ill. 2000) ("the fact that North LaSalle agreed that the Bank could vote its claim as part of a subordination agreement does not provide a basis for disregarding [the voting provision of the Bankruptcy Code]." Similarly, *In re Hart Ski Manufacturing Co*., 5 B.R. 734 (Bankr. D. Minn. 1980), one of the earliest bankruptcy cases dealing with an intercreditor agreement governing the rights of creditors with liens on the same collateral, the court refused to enforce the agreement to the extent it waived any subordinated creditors' rights otherwise granted by the Bankruptcy Code.

Those agreements that have been enforced contained specific waivers, assignment of rights, or express agreements that the juniors would be "silent seconds." For example, in *In re American Roads, LLC,* 496 B.R. 727 (Bankr. S.D.N.Y. 2013), in which an *ad hoc* committee of bondholders objected to the debtor's plan for reorganization despite the existence of a specific "no action" clause that prohibited individual bondholder action, the court held that the bondholders had *specifically* agreed to be barred from instituting proceedings and knowingly relegated their

---

[15] Similar to the ICA, the agreement there broadly provided that junior lien holders would: (i) subordinate their liens, (ii) refrain from taking any actions to enforce rights, and (iii) refrain from exercising any remedies until the senior liens were paid in full.

voting power. Similarly, in *In re Inn Keepers U.S.A. Trust,* 448 B.R. 131 (Bankr. S.D.N.Y. 2011), the court ruled that a securitization trust certificate holder was contractually bound by a no-action clause and could not assert individual objections to bidding procedures because the holder had *expressly* delegated away its power to exercise remedies. *See also Ion Media Networks Inc*., 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (holding that junior lenders were forbidden from objecting to a plan where agreement included express waiver of the right to vote contrary to the senior lenders); *Erickson Retirement Communities,* 425 B.R. 309 (Bankr. N.D. Tex. 2010) (finding that subordinated creditors were banned from seeking appointment of an examiner, where agreement expressly stated that they would not "exercise any rights or remedies or take an action or proceedings to enforce or collect any of the subordinated obligations *without the prior written consent* of the agent until the senior lender had been fully satisfied.") (emphasis added.)

The case law thus shows a clear fission in the treatment of contracts with explicit language and designed to prevent obstructionist behavior by junior lenders and contracts with broad language, directed at maintaining the hierarchy of lien priorities. Here, the ICA falls squarely into the latter bucket. The Bankruptcy Court appropriately likened the contract in the present case to the one in *Boston Generating*. Moreover, it explained the importance of assessing the economics of the underlying transaction so as not to disenfranchise unsecured stakeholders who were trying to contribute to restructuring efforts—instead of likening them to creditors engaging in *ad hoc* obstructionism. Hence, the case law, equities, economics, and practicalities of this case favor a reading of the ICA that does not write an express waiver of voting rights into the general language and does not nullify entire provisions of the agreement, such as Section 5.4.

The Court also quickly addresses Appellants' meek argument that the Bankruptcy Court relied too heavily on *Boston Generating*, 440 B.R. 302. Appellants argue that *Boston Generating*

is actually favorable to them because there, the parties stipulated that the ICA did not prevent the second lien lenders from objecting to the sale, and Judge Chapman implied that without the stipulation, she may have concluded otherwise. (Appellants Br. at 38.) This Court disagrees with Appellants' interpretation. First, the Court finds that the parties' stipulation in *Boston Generating* more likely reflects that they realized that reading the agreement otherwise would be a stretch. Second, the decision does not relay that Judge Chapman was *inclined to agree* with the contrary position, but merely reflects that she was deferring to the parties' stipulation rather than reassessing its merits. Third, this Court finds it quite clear from the contents of the entire opinion that *Boston Generating* overall supports Appellees' positions far more than Appellants'. Fourth, and most importantly, this Court has analyzed district court decisions throughout the nation that looked at contracts similar to the ICA and that reached results both like and unlike that in *Boston Generating*. Thus, even if the Bankruptcy Court relied heavily on *Boston Generating* as a close cousin, this court has consulted the entire family of case law to arrive at its conclusion.

Based on the context of the entire integrated agreement and the industry to which it is germane, the Court finds it unambiguous that the prohibition on hindering the Seniors' remedies was not intended to mean that the Seconds were waiving all the voting rights that they are otherwise entitled to under bankruptcy law.[16] This is particularly so when the ICA expressly granted them unfettered rights as unsecured creditors.

As there were no express constraints or waivers in the ICA, the Bankruptcy Court correctly concluded that Appellants did not plead a plausible claim. Accordingly, the Bankruptcy Court's decision on the interference claim is affirmed.

---

[16] "The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan. If the United States is a creditor or equity security holder, the Secretary of the Treasury may accept or reject the plan on behalf of the United States." 11 U.S. S 1126 (a).

## II.     Turnover Claims

Appellants allege that the Seconds violated ICA Sections 3.1(b) and 4.2 by receiving and retaining (*i.e.* failing to "turn over") various forms of remuneration.  Appellants contend that the remuneration unlawfully received and retained included: (1) common stock in the reorganized MPM; (2) professional fee payments; and (3) the BCA fee. The Bankruptcy Court dismissed all three claims with prejudice, finding that: (1) as a matter of law, the reorganized common stock were not "proceeds" of the Collateral; (2) as a matter of law, the professional fee payments and BCA fee were not received in the Seconds' capacity as *secured* creditors, but as *unsecured* creditors; and (3) ICA Section 5.4 trumps Section 3.1(b) insofar as it requires that to violate Section 3.1(b), the Seconds need to be acting *exclusively* as secured creditors. The Court discusses all these points in turn.

### A.  Receipt of Reorganized Common Stock

Beginning with Appellees' receipt of MPM's reorganized common stock, Appellants pleaded that the Seconds breached ICA Sections 3.1(b) and 4.2 by receiving and retaining proceeds of the Common Collateral before the Seniors were paid in full cash. (*See* Appellants Br. at 16, 34-35). The Bankruptcy Court concluded, as a matter of law, that the Seconds did not violate the ICA because the reorganized stock they received was not and could not be deemed "proceeds" of the Common Collateral.

The Court begins with ICA Section 3.1(b), which provides in pertinent part:

> So long as the Discharge of Senior Lender claims has not occurred, [each Second], agrees that it will not, *in the context of its role as secured creditor*, take or receive any Common Collateral or any *proceeds* of Common Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Common Collateral

ICA § 3.1(b) (emphasis added.) Next, Section 4.2 of the ICA states, in pertinent part:

> Any *Common Collateral or proceeds thereof* received by any [Seconds] in connection with the exercise of any right or remedy (including setoff) relating to the Common Collateral in contravention of this Agreement *shall be segregated and held in trust for the benefit of* … the applicable Senior Lenders

ICA § 4.2 (emphasis added.) In sum, Section 3.1(b) prevents Seconds, in their capacity as *secured creditors*, from obtaining Common Collateral or its "proceeds" as a result of exercising a right or remedy in the Common Collateral, and Section 4.2 mandates that if the Seconds violate Section 3.1(b) (receive Common Collateral or its proceeds in their role as secured creditors), they must then turn over such proceeds to the Seniors.

Consequently, to adequately plead that the Seconds breached Sections 3.1 (b) and 4.2 of the ICA, Seniors had to plausibly allege: (1) the Discharge of Senior's claims had not occurred; (2) the Seconds acted in the context of their role as *secured* creditors; and (3) the Seconds took or received Common Collateral or its *proceeds*; (4) the Seconds did so in connection with the exercise of any right or remedy with respect to any Common Collateral; and (5) the Seconds did not *turn over* remuneration that they unlawfully received.

Here, neither party disputed that the Seniors satisfied the first and fifth requirements. It is the second, third, and fourth elements that are at issue. As such, the Court finds that the Bankruptcy Court's decision must be affirmed if this Court finds that the Seniors did not properly plead that the Common Stock: (1) was obtained by the Seconds in their role as *unsecured* creditors; (2) was neither Common Collateral or its *proceeds*; or (3) was not received in connection with the *exercise of any right or remedy* with respect to any Common Collateral.

The Bankruptcy Court focused on the meaning of "proceeds" and found that the reorganized common stock could not comprise "proceeds" of the Common Collateral as a matter of law. (First Order, A.335.) It explained that in order to be "proceeds," the Common Stock would have had to have been the result of a *change* in the collateral that *diluted* the collateral's value.

(First Order, A.337-340.) In other words, it found that because MPM's collateral did not change, and remained subject to the Seniors' liens, no "proceeds" were generated. (*Id*.)[17] This Court agrees.

As "proceeds" is not defined within the ICA, the Court assesses its definition under U.C.C. Section 9-102(a)(64). Under the U.C.C., "proceeds" is defined quite broadly, encompassing:

(A)     whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B)     whatever is collected on, or distributed on account of, collateral;

(C)     rights arising out of collateral;

(D)     to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E)     to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

U.C.C. Section 9-102(a)(64). But as the Bankruptcy Court and Appellees emphasized, the common thread in each provision is that they all have to do with an action that exhausted, decreased, diluted, or otherwise used up the Common Collateral. (Appellees' Br. at 12; First Order, A.339.)

---

[17]

> As a matter of law, however, I conclude that the new stock to be distributed to the defendants under the plan is not proceeds of the Common Collateral for purposes of New York U.C.C Section 9-102(a)(64), or, for that matter, any other definition of collateral proceeds. From the perspective of the debtors, that stock is not something that any currently secured party's existing lien would attach to even under the expansive definition of "proceeds" in section 9-102(a)(64), because the new common stock comprises proceeds of the defendants; liens and claims, not the proceeds of the debtors' assets that constitute the Common Collateral. It is being received therefore on account of or based on rights arising out of the defendants' liens and claims, not on account of the Common Collateral or based on the rights arising out of the Common Collateral. A party with a lien on the defendants' rights against the debtors could assert that lien against the new common stock to be issued under the plan as the proceeds of its collateral; a creditor, such as the plaintiffs, with a lien on the debtors' assets could not, however, assert a lien against that stock because the debtors'' assets—the Common Collateral—have not been disbursed or distributed with, or otherwise affected by, the disbursement of the new stock. The Common Collateral remains, instead unaffected. The Defendants' lien will change (it, along with the defendants' unsecured claims, will be released under the plan in exchange for the new common stock); however, the property constituting the Common Collateral will not change. Therefore, the new stock is not proceeds of the Common Collateral.

(First Order, A.337-338.)

Here, the Common Collateral did not change from the issuance and distribution of new stock. (First Order, A.338) ("importantly, the property constituting the Common Collateral has stayed the same. There has been no economic event altering the nature of these assets that gives rise to proceeds.") As a matter of economics, this Court finds that the literal exchange or transformation of the object comprising the collateral is necessary. Liened collateral cannot be extrapolated to include the debtor's other assets that do not relate to, or directly derive from, that collateral. The very reason a lien creditor is given an encumbrance on tangible collateral is to vest the creditor with a redeemable right, which it can effectuate in a particular manner, based on the type of collateralized property.

This is precisely why Bankruptcy Code provisions, such as Section 362 and 363, provide that a lien creditor's "interest in property" includes the *right* of a secured creditor to have the security applied towards the creditor's loan when the reorganization is complete, but also provides that if the security is depreciating during the term of an automatic stay, secured creditors may, *in exchange*, attain cash payments, additional security, or be exempted from the stay and take immediate possession of (*i.e.* foreclose upon) the defaulted security and apply it to payment of the debt. *See e.g. Nobelman v. American Sav. Bank*, 508 U.S. 324, 330 113 S.Ct. 2106 (1993) ("The lender's power to enforce its rights—and, in particular, its right to foreclose on the property in the event of default—is checked by the Bankruptcy Code's automatic stay provision."). In other words, the Code consistently balances the debtors' need for reorganization against secured creditors' remedies available based on *the type of collateral* upon which they have liens.

Here, as the Bankruptcy Court explained, "the first and 1.5 lien holders continue to retain their liens on all of the Common Collateral. That collateral will not have been diminished one iota by the distribution of new stock under the plan to the defendants." (First Order, A.338.) Further,

as the Bankruptcy Court explained, the U.C.C. definition of "proceeds" was broadened so that when unexpected events occurred that exhausted or consumed some of the collateral's economic value or productive capacity, the liened creditor could pursue the tangible remnants of the exact collateral upon which it had a lien—or it could pursue the property right which bore the lost value of the transformed collateral, such as insurance policy proceeds, or trademark infringement lawsuits.[18] *See e.g., Johnson v. Home State Bank*, 501 U.S. 78, 111 S. Ct. 2150 (1991) (holding that a mortgage which survived a Chapter 7 discharge of debtor's personal liability invited a claim by the lien creditor, even after debtor's personal obligation was extinguished, as mortgagee still retained right to payment in the form of proceeds from the sale of the property.) Appellants cannot audaciously, and without any authority, expect the Court to erode the critical distinction between a debtor's possessory interest in tangible collateral with a creditor's security interest in its lien.

The Court also agrees with the Bankruptcy Court's position that the relationship of the property to the *debtor* versus the *creditor* is critical to assessing whether such property constitutes "proceeds" of the collateral. (First Order, A.337-338.) As Judge Drain aptly explained, the property interest in the reorganized common stock belongs to the party who is vulnerable to an encumbrance affixing to that property: "From the perspective of the debtors, that stock is not something that any currently secured party's existing lien would attach to even under the expansive

---

[18]

       That would include …**insurance**, which some cases had excluded from prior definition; or … **rights based on nonconformity, interference with the use of, or defects, or infringement of rights in, or damage to, collateral**; or, in fact, **anything that reflects a change in the collateral**, as the collateral proceeded from one form of economic value to another. Underlying this common-sense approach is the notion that the secured creditor bargained for a lien on a piece of property. If that property is altered, the secured creditor I s entitled to it in its altered form, as collateral proceeds if the parties intended the lien to extend to proceeds. Thus, if collateral is damaged, the secured creditor's lien should extend to its proceeds in the form of insurance, and if the value of collateral in the form of intellectual property is reduced by infringement, the secured creditor's lien should extend to the debtor's **infringement claim**, as proceeds.

(First Order, A.339-340.)

definition of "proceeds" in Section 9-102(a)(64), because the new common stock comprises proceeds of the defendants' liens and claims, not the proceeds of the debtors' assets that constitute the Common Collateral." (*Id.*) In other words, it matters that a party with rights against the Seconds could assert a lien interest in the common stock to pursue their rights, but a party with a right to the Common Collateral could not assert a lien on the common stock.

Appellants also wrongly assert that an interpretation focused upon a diminution in the value of the Common Collateral unduly narrows the U.C.C. definition. Indeed, their position misstates real interest at jeopardy. Broadening the definition of proceeds beyond direct lineage of liened collateral would be treacherous and could completely disable debtors from restructuring, whilst allowing secured creditors to simultaneously maintain unencumbered liens and scavenge on all assets in bird's-eye view.

Neither the U.C.C. nor the Bankruptcy Code was designed with such a purpose in mind. Rather, the Bankruptcy Code was designed to resolve coordination problems and prevent a "race to the courthouse" when multiple creditors held conflicting claims against a debtor. *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law,* 10-11 (1986). It was also supposed to guide the court as to "what should be done with the property, person, and obligations of an insolvent debtor," and "to provide an orderly procedure under which all creditors are treated equally." *LNC Investments, Inc. v. First Fid. Bank*, 247 B.R. 38, 43-33 (S.D.N.Y. 2000), *adhered to on denial of reconsideration*, No. 92-cv-7584, 2000 WL 461612 (S.D.N.Y. Apr. 18, 2000) (citing Historical and Statutory Notes following 11 U.S. § 361 (1993)). As Judge Drain and Appellees demonstrated, the U.C.C. was similarly drafted to accommodate economics and not conflate different assets and property interests.[19]

---

[19] For example, Judge Drain assessed the text and legislative history of U.C.C. Article 9-102 (a) (64). (*See* Frist Order, A. 335-337.) He also assessed official comments made to the U.C.C. (*Id.* at A.338.) Further, he not only cited the

Finally, the Court addresses Appellants' convoluted waiver argument. Appellants argue that Seconds "do not have the right to surrender their liens in the Common Collateral in order to obtain something of value from MPM ahead of the Senior Lenders." (Appellants Br. at 21.) In support of this argument, Appellants cite Section 3.1(a) of the ICA, which reads, in pertinent part:

> [s]o long as the Discharge of Senior Lender Claims has not occurred … except as otherwise provided herein, the Intercreditor Agent and the Senior Lenders shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Common Collateral without any consultation with or the consent of any Second-Priority Agent or any Second-Priority Secured Party.

ICA § 3.1(a).

The Seniors interpret the above provision to mean that the Seconds' sole right is to hold a lien, and thus they cannot waive it. The Court, however, agrees with Appellees' interpretation that surrendering or waiving a lien on the Common Collateral is not exercising a right, but the *absence* of a right. (Appellees Br. at 18.) For the same reasons that the Court was unwilling to read that the Seconds waived their right to vote into broad general provisions of the ICA, the Court again refuses to read that the Seconds waived their right to surrender their lien interests absent specific language to that effect—especially when bankruptcy law otherwise allows them to do so. *See United Sav. Ass'n of Texas v. Timbers*, 484 U.S. 365 (explaining that "an undersecured creditor is entitled to 'surrender or waive his security and prove his entire claim as an unsecured one.") (quoting *United States Nat. Bank v. Chase Nat. Bank*, 331 U.S. 28, 34, 67 S.Ct. 1041, 1044 (1947)); *In re 56 Walker LLC*, No. 13-cv-11571, 2014 WL 2927809, at *3 (Bankr. S.D.N.Y. June 27, 2014) ("there is no

---

very influential article written by Wilson Freyerouth, entitled *Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9-306*, 69 Tul. L. Rev. 645 (1995), but he explained how the concepts in the article affected the case law and statutory text of U.C.C. Article 9-102 (a) (64). Most importantly, Judge Drain demonstrated the symbiotic relationship between his interpretation of "proceeds" based on text, legislative history, and scholarly sources and the economics underlying the issues in this case. (*Id.* at A.339-341.) Appellees, too, relied on these sources as well as multiple treatises and a range of credible case law supporting the economics and logic of their position. (*See* Appellees Br. at 12-15.).

principle of bankruptcy law that precludes [a secured creditor] from agreeing to waive its interest or fees or even principal to allow a distribution to other creditors"); *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 735 F. Supp. 2d 42, 66 (S.D.N.Y. 2010) ("Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned.").

Additionally, this Court reads 3.1(a) to specifically provide that the Seconds do not have any rights to release, dispose or restrict disposition "*of the Common Collateral*." ICA § 3.1(a) (emphasis added). The Seniors' argument that the Seconds thus cannot dispose *of their lien on* the Common Collateral is a weak attempt at the shell game and again derives from their conflating the debtor's possessory interest in tangible collateral with the creditor's separate security interest in their lien. The Court has already rejected such logic. Moreover, the Court agrees with Appellants that the U.C.C. and Bankruptcy Code did not intend to make such a conflation, or concepts such as indubitable equivalence would lose functionality.[20] The Court cannot nullify foundational provisions of the Bankruptcy Code to prop an illogical reading of the ICA.

In sum, although the term "proceeds" can arguably yield to different meanings outside of the bankruptcy context, here, the Court finds it clear beyond a doubt that proceeds was never intended to—and as a matter of economics cannot—refer to the reorganized common stock that the Seconds received in return for giving up their liens to the Common Collateral and restructuring their swath of unsecured debt. The Seniors, who never discharged their liens and claims on the Common Collateral, are not entitled to turnover payments just because the Seconds' did.[21]

---

[20] Judge Drain and Appellees logically explain that the very fact that certain cases have analyzed whether stock of a reorganized debtor could, in certain circumstances, constitute the "indubitable equivalent" of a payout for a security interest means that reorganized stock is not the security interest itself. (First Order, A.340-41; Appellees Br. at 20.)

[21] "Instead, the defendants now have a right to receive new stock in the reorganized enterprise in return for the discharge of their prior liens and claim; the debtors have not received such stock in lieu of any Common Collateral, which fully remains, again, subject to the plaintiffs' liens." (First Order, A.338.)

Certainly, there are inconveniences to not receiving a maximal payout when a debtor files petition. But that is a cost the Seniors must bear. *United Sav. Ass'n of Texas*, 484 U.S. at 379 ("That secured creditors do not bear one kind of reorganization cost does not mean that they bear none of them."). Accordingly, the lower court's decision on this claim is affirmed.

### B. Receipt of $30 Million Fee Pursuant to BCA

Appellants next argue that the Seconds are not entitled to retain a $30 million Backstop Commitment Fee ("BCA Fee"), which was also paid in reorganized MPM common stock. (Appellants Br. at 33-34.) This Court has just explained why no claim based on reading "proceeds" of the Common Collateral to include MPM's reorganized stock is legally plausible. Moreover, the next discussion on professional fees will reveal additional pleading deficiencies that apply to all three turnover claims. Accordingly, dismissal of this claim is affirmed.

### C. Reimbursement of Legal Fees under BCA and RSA

The Court next turns to Appellants' claim that the Bankruptcy Court erred in dismissing the Seniors' claims based on the Seconds' receipt and retention of millions of dollars in professional fees under the RSA. (Appellants Br. at 23.) The Bankruptcy Court dismissed this claim multiple times on several different grounds. The Court addresses each.

#### 1. Pleadings in the First Amended Complaint

In the First Order, the Bankruptcy Court found that the Seniors' claim, as pleaded, was insufficient to satisfy *Iqbal,* 556 U.S. 662, and *Twombly,* 550 U.S., 545-46. (First Order, A.318) ("The complaints rarely, if ever, specify the provisions of the [ICA] that are claimed to have been breached by the foregoing conduct."). Indeed, in the FAC, Appellants' claim was merely:

> under the RSA, the Debtors will pay professional fees of the RSA Parties. The professional fees will be paid out of Common Collateral or the proceeds thereof. Because the Senior Lenders' claims, including those of the First Lien Lenders, have not been discharged (paid in full in cash), this is a violation of the [ICA]

(FAC ¶ 56, A.36.). Judge Drain stated: "I cannot discern the basis for defendants' right to be reimbursed their professional fees currently during this case, because the complaints do not make it clear and no party has identified it in documents that I may consider in connection with these motions." (First Order, A. 334.) He added that there were several possible bases for their receiving such fees, some of which facially would not implicate the ICA:

> there may be more than one source for the defendants' right to such payments, including (a) under the Court-approved [RSA] in the form of an unsecured administrative expense, which as not deriving from the exercise of remedies against the Common Collateral, may not support a claim under Section 4.2 of the [ICA], and/or (b) as part of the provision of adequate protection of the defendants' lien, which arguably would violate section 4.2.

(*Id*.) Basically, Judge Drain initially indicated that if the professional fees were administrative expenses pursuant to the RSA, they would not facially violate Section 4.2 because they would be administrative expenses pursuant to a court-approved agreement that does not seem tied to the Common Collateral; whereas, if the fees were adequate protection for the Seconds' lien, they *arguably* could. Consequently, Judge Drain was unable to rule as to whether Appellees pleaded a viable claim as a matter of law, but found the pleadings deficient under *Iqbal* and *Twombly*.

This Court agrees that the first iteration of Appellants' claim was far too general and conclusory to meet the standards of specificity and plausibility under *Iqbal* and *Twombly*. In *Twombly,* 550 U.S. 545-46, a similarly complex litigation, the Supreme Court explained that the standard for pleading a violation of the Sherman Act needed to be more than just "a short and plain statement of the claim showing that the pleader is entitled to relief" as had previously been required. *Conley v. Gibson*, 335 U.S. 41, 4778 S.Ct. 99 (1957)); *see* Fed. R. Civ. P. 8(a)(2). The Court explained that "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the 'plain

statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id*. at 545. The Court added that this additional plausibility requirement "serves the practical purpose of preventing a plaintiff with a largely groundless claim from taking up the time of a number of other people with the right to do so representing an *in terrorem* increment of the settlement value." (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577) (internal quotation marks omitted). *See also id*. at 558. ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.") (citation omitted).

The entire reasoning of *Twombly* reflects the Supreme Court's acute awareness of the nature of complex commercial litigation, which is extremely expensive and cumbersome. *See id*. at 559 (discussing that discovery accounts for as much as 90 percent of litigation costs when it is actively employed.) Hence, it is now incumbent on district courts to properly vet allegations for genuine plausibility. *See id*. at 570 ("it is one thing to be cautious before dismissing [a] complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive… a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

Here, Appellants' initial pleadings contained no specificity as to the ICA provision that was breached, nor any purportedly unlawful basis for Appellees' receipt of professional fees, other than a conclusory reference to proceeds of the Common Collateral. Accordingly, this Court affirms the Bankruptcy Court's initial determination that the pleadings were implausibly pleaded. To hold otherwise would only subject parties to an unnecessary and costly fishing expedition, of precisely the type the Supreme Court sought to curtail.

## 2. First Lien and 1.5 Lien Trustees' Proposed Second Amended Complaint

Appellants then provided some additional specificity in the Proposed Amended Complaints submitted by the First Lien Trustee and the 1.5 Lien Trustee. (*See* First Lien Trustee Proposed Amended Complaint, ("First Proposed SAC"), A.579-84 at ¶¶ 53-64; 1.5 Lien Trustee Proposed Amended Complaint, ("1.5 Proposed SAC"), A.1782-85 at ¶¶ 50-57.) These iterations stated: "[t]he Second-Priority Secured Parties have received millions of dollars in Common Collateral *in the context of their role as secured creditors* in violation of the Intercreditor Agreement") (First Proposed SAC ¶ 53; 1.5 Proposed SAC ¶ 50.) (emphasis added). The proposed pleadings further added that the receipt of professional fees was "*adequate protection* for the [Seconds'] liens." (First Proposed PAC ¶ 60; 1.5 Proposed PAC ¶ 57) (emphasis added).

The Court interprets the proposed amended complaints as providing two additional pertinent allegations. The first is that the Seconds violated the ICA *in the context of their role as secured creditors*. The second is that the fees received were *adequate protection* for their liens. The Court addresses each.

### a. Role as Secured Creditors

Beginning with the allegation that the Seconds' violated the ICA by accepting professional fees *in the context of their role as secured creditors*, the Court finds that the Trustees still failed to plead the *basis* for this conclusion. In fact, the proposed amendments admitted that the First and 1.5 Lien Trustees had "*no information to suggest that any of the funds that the [Seconds] received were received in connection with the RSA or BCA and not in the context of their role as secured creditors.*" (First PAC ¶ 60; 1.5 PAC ¶ 57) (emphasis added.)

Without any factual basis for this conclusion, the Court must find that the Trustees made this statement on mere speculation, which is insufficient. *See Twombly*, 550 U.S. at 558. ("a naked

assertion…gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.'"). The Trustees likely knew that pleading that Appellees received professional fees *as secured creditors* was vital because Judge Drain had already indicated that he considered what the Seconds did under the BCA to be entirely within their rights as *unsecured* creditors:

> with respect to the ***$30 million charge under the [BCA]***… that cash could be viewed as Common Collateral (although all parties agree that such collateral does not comprise all of the debtor's assets), the payment, if made, will be based on the ***defendants' rights under the [BCA], not in respect of remedies as secured creditors***. Such payment would ***not be on account of a secured obligation*** but, rather, a ***separate, unsecured obligation undertaken by the debtors*** to the defendants for backstopping new exit financing for the debtors beyond the time provided in the [BCA].

(First Order, A.333-34) (emphases added). Clearly evident is Judge Drain's cognizance of the Seconds' status as the fulcrum security holders who had some secured, but mostly unsecured, interests in MPM.[22] Hence, he implied what this Court explained earlier—that the Seconds had nearly unfettered rights whenever they wore just their *unsecured* hats.

Thus, not pleading that the Seconds acted in their role *as secured creditors* would have been an immediate death trap. But making fast and loose allegations, without providing one iota of affirmative factual support, is also not enough to plead a plausible claim under the federal rules. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678-79 (citing 550 U.S. at 555) ("Rule 8… does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.) Accordingly, the Court agrees that the mere addition of the allegation that Seconds acted *as secured creditors*, was still not enough to state a claim.

---

[22] "[I]t is acknowledged that a significant amount, in fact the majority, of the second lien holders' claims are unsecured deficiency claims." (First Order, A.336.)

### b. Adequate Protection

The Court turns to Appellants' second added allegation—that the Appellees received legal fees as *adequate protection* for their liens. Although this phrase itself was casually added into Paragraphs 57 and 60 of the First Proposed SAC and 1.5 Proposed SAC, respectively, Judge Drain focused on the way it was implicitly referenced in Paragraph 11. That paragraph now included that: "[i]n addition, on information and belief, most of those fees, such as those incurred 'in connection with the Restructuring and any ancillary efforts related thereto,' Restructuring Support Agreement Section 1.1(a)(xi), were incurred in the context of the [Seconds'] roles as secured creditors." (First Proposed SAC, ¶ 11, A.562-563.) Judge Drain read this sentence as referring to the Final DIP Order.[23] On the merits, the Court finds that this additional allegation was still insufficient to allow the claim to survive.[24]

On December 20, 2015, the Bankruptcy Court held a hearing to discuss the viability of the Proposed SACs. (*See* December 20, 2015 Transcript ("Transcript"), A.1039-1042.) In addition to discussing the Proposed SAC's specificity issues, the Court also discussed the lack of merit in pleading that the attorney's fees were received by the Seconds in their role as secured creditors *pursuant to the Final DIP Order*. The gist of Appellants' argument based on professional fees under the DIP Order was that their turnover claim should stand if it was plausible that the Seconds

---

[23] A DIP Order is a financing order to assist a "Debtor-in-Possession" (DIP). A DIP is usually a person or corporation that has filed for bankruptcy but still holds property to which a creditor has a right. Here, MPM was a DIP because it was a corporation that would continue to operate during its Chapter 11 proceedings. Because MPM still had legal claims attached to its property and assets, it operated similar to a trustee in that it had to maintain the best interest of its creditors. As DIPs often have to file DIP financing following their filing of a Chapter 11 bankruptcy, a court order is necessary to approve such financing and assist the DIP with running itself until it can be sold. Here, the Bankruptcy Court entered Final DIP Order related to MPM's DIP financing on May 23, 2014. (*See* A.2870-2937.)

[24] Because the Proposed SACs do not even mention the DIP Order, this Court could disregard the plausibility of this claim on specificity grounds alone. But because the lower court found that it was impliedly referred to in Paragraph 11 of the Proposed SAC, and discussed its merits, so too will this Court.

received the professional fees as "adequate protection" for their liens. (*See* Transcript, A.1039-1042.) Appellants' reasoning was that if the professional fees were *ever* deemed adequate protection for the Seconds' liens, even for a transient time period, then they were temporarily cash proceeds of the Common Collateral that the Seconds received *in exercise of their rights or remedies for their secured liens on the Common Collateral*. (*See id.*) Further, as the Seconds received such fees prior to the Seniors' payment in full cash for their liens, the Seconds' receipt of such fees violated of the ICA's turnover provisions.

Throughout the hearing, Judge Drain represented that the argument based on the Final DIP Order was a "red herring." (Transcript, A.1403.) Thus, while Appellants repeatedly discussed the *implausibility* of Appellees' position that "the final DIP order authorized the payment of fees 'as a form of adequate protection to the second lien noteholders only if the second lien noteholders were oversecured,'" Judge Drain emphasized that the Seconds' had lost their motion based on adequate protection and he *himself added* the sentence that retention of fees was "subject to the standard set forth in section 506(b) of the Bankruptcy Code." He repeatedly explained that he did not add the Code provision because he believed that the Seconds *actually* received fees as adequate protection, but as matter of practice because the Code provides that fees may be paid to a secured creditor as adequate protection only if the creditor is oversecured; otherwise, the Code requires them to be recharacterized as principal. (Transcript, A.1039-1040.)[25]

---

[25] Section 506(b) of the Bankruptcy Code provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

In lay terms, this provision means that the Seconds could only receive such fees as adequate protection if they were oversecured. If they were undersecured, and the payments were still dolled out *on the basis of being adequate protection* for secured liens, the payments would have to be recharacterized as payment of principle.

> THE COURT: That's true. And [the Seconds] did ask for it as a basis of adequate protection when they made their motion, but they lost on that point…. I raised the allocation issue, the 506(b) issue. The transcript's very clear on that point. I'll read it to you if you want…So the award of fees, no, the payment of fees, is very clearly subject to 506(b). And if [the Seconds] were not entitled to them as an oversecured creditor, they would have to be paid back, or if they were going to be getting cash under the plan, they'd be reallocated in principle.

(Transcript, A.1040.)

In sum, Judge Drain repeatedly explained that even though the Final DIP Order contained a provision stating that the fees *could be* deemed adequate protection in the event that the creditor was oversecured, he added Section 506(b) language to ensure that if that were not the case, the fees would be recharacterized as principle, per the Bankruptcy Code. He did not add the provision because: the Seconds were actually oversecured, the payments actually were adequate protection, or because they actually needed to be recharacterized as principle.  None of those were the case. The language was included as a Code-abiding insurance policy, with the Court knowing what everyone knew at the time of the Final DIP Order—that the Seconds were *massively undersecured*.[26]

As Appellants did not provide a single fact to color their conclusory allegation that such payments were, *in fact*, improperly retained as adequate protection, or were ever deemed principal for their lien, the Court finds Appellants' claim untenable on that basis and affirms the Bankruptcy Court's decision to deny its plausibility as a matter of law.

---

[26] "There's no dispute they got the money, … if they did get the money on account of their secured claim, then yes, they would violate 3.1. But under the DIP order, they only got the money if it was on account of their secured claim. …the DIP order gives them a right to it only if it's on account of their secured claim, but that doesn't mean that it was on account of their secured claim, because the DIP order also said that they couldn't get it on account of their secured claim if they're undersecured. That's what the reference to 506 (b) means." (Transcript, A.1043.)

### 3. First Lien Trustee's Proposed Third Amended Complaint

Following the December 20, 2015 hearing, in a final attempt to plead a plausible breach of the ICA's turnover provision, the First Lien Trustee filed a Proposed TAC, abandoning the DIP argument and instead adopting an argument based on the RSA and BCA.[27] The Court notes that, in this iteration, the Seniors directly contradicted what they represented in their Proposed SAC. (*Compare* "[the Trustees have] no information to suggest that any of the funds that the [Seconds] received were received in connection with the RSA or BCA" *with* "any reimbursements that the Debtors paid to the Second Lien Noteholders after the petition date were made pursuant to the RSA and BCA.") "(First Proposed PAC ¶ 60; 1.5 PAC ¶ 57; Proposed TAC ¶ 55.)

In Support of this new allegation, the Seniors argued that: 1) the Seconds received professional fees pursuant to the RSA and BCA as part of a negotiation concerning the amount that they would receive <u>on account of their secured claims</u>; 2) the RSA and BCA were <u>inherently intermingled</u>, and the fee provisions cannot be considered separately; and 3) under the plain and ordinary language of the ICA, the Seconds "<u>exercised rights or remedies with respect to the Common Collateral</u>." (Notice of Proposed TAC, A.995-A.1016.) The Court rejects each of these.

#### a. Seconds' Status During RSA and BCA Negotiations

Beginning with the argument that Seconds received professional fees pursuant to the RSA and BCA as part of a negotiation concerning the amount that they would receive *on account of their secured claims*, the Court finds that Appellants again make a sweeping conclusory statement without providing any colorable facts. Upon reviewing the Proposed TAC with all the supposed "admissions" made by the Seconds, (*see* A.968-969), the transcript from the hearing that was held on May 8, 2015 (Transcript from May 8, 2015 ("Second Transcript"), A.1238-1336), and all the

---

[27] While the Court reads the Proposed TAC as entirely abandoning the DIP Order, to the extent that the Seniors believe it is part of the proposed TAC, the Court rejects its plausibility for the reasons already described.

documents incorporated in the Complaint, this Court does not find facts showing that the Seconds ever represented anything other than that they were holders of fulcrum securities when negotiating the RSA and BCA. The Court finds that such a representation is *not* equivalent to them admitting that they were leveraging their *secured status exclusively* in entering negotiations, and it is misleading for Appellants to so contend.

Again, the Court belabors that the Seconds being holders *of fulcrum securities* was critical. While the Seniors repeatedly argued that it was the Seconds' secured claims, rather than their unsecured claims, that got them a "seat at the table"—that is, allowed them to negotiate the RSA and enter the BCA—the Court finds that such an argument defies common sense and the economics of restructurings. As Judge Drain discussed, if it was exclusively the secured interest that brought the Seconds to the BCA and RSA table, then the First and 1.5 Lienholders would have been the key players, since their secured claims were much larger than those of the Seconds. (*See* Second Transcript.) It was not just the Seconds' secured claims that elevated their status. It was that they had an intertwined small secured claim and huge deficiency claim.[28]

Ironically, in their Notice for a Proposed TAC, the Seniors even acknowledged that "the Debtors could not restructure without reducing their debt obligations, and [ ] they were *required to either pay the Second Lien Noteholders' secured claims in full or obtain the Second Lien Noteholders' consent to different treatment*." (Notice of Proposed TAC, A.1008-09) (emphasis added). They even cited a case that they claimed reflects that secured creditors are entitled "to all proceeds of their collateral until their liens are paid in full." *See id*. at n.6) (citing *In re 56 Walker*,

---

[28] "It's the mixed nature here that makes them the Fulcrum. They're the fulcrum because they're right on the edge of both. They're like inextricable…That's the whole point of being a Fulcrum Security, is that you straddle, you straddle the key issues so they have to deal with you." (*Second Transcript*, A.1252-1254.)

No. 13-cv-11571, 2014 WL 2927809, at *3). While Appellants may contend otherwise, their case supports the fact that the Seconds were entitled to the *full value* of their prepetition secured claims until they agreed otherwise. This is why secured creditors attain liens on anything in the first place:

> The secured creditor, not willing to rely on the debtor's credit alone, has bargained for and received a security interest in some portion of the debtor's property, which serves as collateral for the debtor's obligation. Prepetition, secured creditors usually have the power to take over the collateralized property if the debtor defaults. The foreclosed home, the repossessed car, are familiar and melancholy examples of the exercise of that power.

*LNC Investments, Inc. v. First Fid. Bank*, 247 B.R. 38, 43 (S.D.N.Y. 2000), *adhered to on denial of reconsideration*, No. 92-cv-7584, 2000 WL 461612 (S.D.N.Y. Apr. 18, 2000).

Again, as this Court explained before, the Seconds had a *fully secured interest* in MPM. The 2006 Indenture gave them "springing lien notes" that were triggered well before MPM filed its petition. Thus, the Seconds were *fully secured* prepetition, but undersecured on the date of petition. Their leverage therefore came from the fact that they were deeply undersecured due to their $1 billion deficiency. Judge Drain even discussed that fulcrum security holders usually are the key players in restructuring agreements because their deficiency claims often swallow all the other unsecured claims. (*See* First Hearing, A.1071.)[29] Indeed, other courts have found that fulcrum security holders play a special role in restructurings due to their unique position based on their *combination* of secured and deficiency claims. For example, in *Charter Commc'ns*, the Court explained why, when the debtor company needed to reorganize and raise new equity, the fulcrum security holders would be given the option to convert their bonds to equity interests and invest in the reorganized capital structure of the emerged debtor company. 419 B.R. at 233 ("In effect,

---

[29] "it is more often than not the case that when there is an undersecured creditor—right, if not more— it's very often the case that when there's an undersecured creditor, the deficiency claim alone swamps all the other unsecured creditors. And therefore, they're the fulcrum security because of their deficiency claim as much as anything."

holders of fulcrum securities are at the tipping point of the capital structure (neither entirely in nor out of the money) and given their impairment and entitlement to vote for or against a chapter 11 plan are in a position to have considerable influence over the outcome of a restructuring.")

Because the Seconds' secured claim was only $345 million, one third the size of their $1 billion undersecured claim, Judge Drain emphasized: "their unsecured claim is *bigger* than their secured claim. So in terms of cram-down, they're *really important*, not just because they're a secured claim, but *because they have a huge deficiency claim*, and their rights vis-à-vis the senior subordinated noteholders." (Second Transcript, A.1249) (emphases added.)

If it was not crystal clear to the Seniors before, let the Court make it crystal clear now: the Seconds' status as the fulcrum security holder was *not* a mundane fact. It deeply mattered because they were the *most vulnerable of the secured lenders* and simultaneously the *most senior of the unsecured lenders*. They were not akin to the other SubNoteholders who had only $382 million of purely unsecured debt from the onset. The Second Circuit made this clear in its confirmation decision. *See In re MPM Silicones, L.L.C.*, 874 F.3d 787 (holding that the SubNotesholders' unsecured claims were subordinated to those of the Seconds because the 2006 Indenture relegated SubNotesholders' claims below those of "Senior Indebtedness" in which the Seconds were included); *See also LNC Investments, Inc. v. First Fid. Bank*, 247 B.R. 38 (explaining that even compared to the undersecured creditors, the "prepetition creditor who has relied solely on the debtor's credit is unsecured and takes *last among all creditors* in the distribution of the debtor's assets.").

### b. Degree to which RSA and BCA are Inherently Intermingled

Appellants next argue that the RSA and BCA are inherently intermingled. (*See* Notice of Proposed TAC, A. 1009-1010) ("The viability of the BCA was 'dependent upon…each and every

component' of both the RSA and the BCA."). Appellees contend that these could not be viewed as "as single integrated contract" as the Bankruptcy Court already determined that: 1) the BCA was negotiated separately from the RSA; 2) there are different termination provisions of the BCA and RSA; 3) there is a lack of complete identity among the parties to the BCA and RSA; 3) parties to the RSA could sell their claims and thereby exit the RSA and any obligations thereunder; 4) the consideration given by MPM under the BCA was in return for completely different performance than under the RSA; and 5) there was separate and differently timed approvals of the RSA and BCA by the Bankruptcy Court. (Appellees Br. at 33-34) (citing Second Transcript, A.1323-1324.)

Upon reviewing all the reasons that the Bankruptcy Court provided in the May 8, 2015 hearing, this Court agrees with Judge Drain's final conclusion that while the BCA and RSA were related, they were not intermingled or one integrated contract. While the BCA was the underwriting deal that facilitated the RSA, the RSA is what restructured MPM creditors' exit rights. (*See id*.) ("I agree that the agreements have a close relationship, but I conclude, by looking at them at their face, that, in fact—and the complaint lacks any allegation to the contrary—that the consideration under the RSA was, in fact, the parties' performance of the BCA, expressly including the fees provided for in the BCA. That agreement was separately approved. It has separate termination provisions from the RSA…").

Before moving on to Appellants' last argument in support of their Proposed TAC, the Court briefly addresses one more distinction between the BCA and RSA, which regards what "hats" the Seconds wore when they negotiated them. Again, the Court notes that the BCA was an agreement under which the Seconds agreed to underwrite MPM's *new* issuance of $600 million of capital through a rights offering that would allow subscribers to purchase new Reorganized MPM Stock. Consequently, just as Judge Drain concluded in his First Order, this Court finds that the BCA

underwriting had *nothing* to do with the Common Collateral, its previously affixed liens, or the Seconds' role as secured creditors. (*See* First Order, A.333-34) ("Such payment would not be on account of a secured obligation but, rather, a *separate, unsecured obligation* undertaken by the debtors to the defendants for backstopping new exit financing for the debtors beyond the time provided in the [BCA].") In sum, this Court holds that because the BCA was an agreement about how the Seconds would fund MPM's *new* equity, when they participated in it, they wore *only* their unsecured hats.

That leaves only a very discreet unresolved issue before the Court as to whether the Seconds wore both their hats when they entered the RSA. This Court believes, based on a review of the admissible record and cases in which fulcrum security holders have participated in restructurings, that even with the RSA, it was likely the Seconds' *unsecured* deficiency claims that brought them a seat at the table, not their secured claims. But just as Judge Drain indicated, here it is *factually impossible* to parse out which percentage of which hat the Seconds wore when they negotiated the RSA, and even Appellees acknowledged that in "some metaphysical respect," it is ostensible that the Seconds were wearing both hats when they negotiated the RSA.[30]

On this point, the Court determines two things. First, determining a party's lien-based status in entering a restructuring agreement is a question of law for the Bankruptcy Court, not a question of fact-finding for a jury. *See LNC Investments, Inc. v. First Fid. Bank*, 247 B.R. 38, 40 (S.D.N.Y. 2000), *adhered to on denial of reconsideration*, No. 92-cv-7584, 2000 WL 461612

---

[30]
> What this is—what this has all boiled down to, it appears now, is a claim that the second liens were not entitled under the ICA to enter into the [RSA or the BCA], because in some metaphysical respect, some portion of that action is attributable to them in their capacity as secured creditors at the same time that concededly a portion of it has to be attributable to them in their capacity as unsecured creditors, were they had, by far, the larger claim.

(Second Transcript, A.1105) (Counsel for Appellees speaking.)

(S.D.N.Y. Apr. 18, 2000) (explaining that determining the priority status of creditors' claims is a question of law that arises out of the Bankruptcy Code); *In re SW Boston Hotel Venture, LLC*, 748 F.3d 393 (1st Cir. 2014) (explaining that "courts should determine secured status and collateral value" and therefore holding that it was proper for the bankruptcy court to decide when a creditor became oversecured). Accordingly, it was appropriate for the Bankruptcy Court to hold that this issue alone did not create a triable claim.

Second, whilst the BCA and RSA were separate agreements, to the extent that the Seconds received their Professional Fees through either agreement, receipt of such fees still cannot be deemed "the exercise of rights or remedies with respect to the Common Collateral" as matter of law. The Court discusses the reasons for this next.

### c. Exercise of Rights and Remedies in Respect to Common Collateral

Appellees urge the Court to look to the plain and ordinary meaning of ICA and find that in accepting their Professional fees, the Second took proceeds of the Common Collateral "in connection with the exercise of any right or remedy … with respect to any Common Collateral." (*See* Notice of Proposed TAC, A. 1011-1013) (citing ICA § 3.1(b)).

Appellants argue that "exercise" is defined as "the act of bringing into play," "any right" is plainly defined as any capacity to assert a legally recognized claim," and "remedy" is defined means to enforce a right with or without resort to a tribunal. (*See id.*) (citing Mirriam-Webster Unabridged Dictionary (2015); Black's Law Dictionary (10th ed. 2014)). They further argue that "[a] component of the plan was the functional equivalent of a voluntary foreclosure" as "MPM agreed to give 100% control of the company to the Second Lien Noteholders in exchange for the Second Lien Noteholders' release of their secured interest in the Debtor's assets." Hence, "by using their secured creditor status to negotiate the terms under which their claims would be paid,

46

the [Seconds] were exercising their remedies with the respect to the Common Collateral." (*Id.*) Appellants cite *Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.*, No. CIV. 06-1534, 2009 WL 702009 (D. Minn. Mar. 13, 2009), *aff'd sub nom. Bremer Bank v. John Hancock Life Ins. Co.*, 601 F.3d 824 (8th Cir. 2010) and *In re Delta Air Lines, Inc.*, 313 F. App'x 430 (2d Cir. 2009), which they argue, stand for the proposition that negotiating the terms or restructuring of an aircraft lease constitutes an exercise of "any right or remedy." (*See* Notice of Proposed TAC, A.1013). This Court respectfully disagrees with Appellants' position.

To start, the Court reiterates the basic structure of the ICA agreement. The ICA is structured such that Section 2 first establishes the general lien priority structure. Section 3 discusses remedies with respect to the Common Collateral and its proceeds, and it contains the above-referenced language related to Appellants' instant grievance. Section 4 then contains the "turnover" provision that Appellants argue is implicated once they plausibly plead a breach of Section 3. And Section 5 is the broad carve-out that this Court already analyzed earlier when discussing the Seconds' voting rights. It is the provision that this Court and Judge Drain determined to be unambiguous in granting the Seconds nearly unfettered reign to act against the Company or other creditors when acting as unsecured creditors.

The Court mentions this structure again for two reasons. First, the Court re-emphasizes that it believes that proper contract interpretation, just like proper statutory interpretation, is necessarily a "holistic endeavor." *United Sav. Ass'n of Texas v. Timbers*, 484 U.S. at 371. Thus, the Court finds that employing the plain and ordinary meaning of terms does not mean decontextualizing them from their source, but determining a basic meaning that fits their location and purpose.

Second, this Court already employed this method earlier when discussing how ICA Sections 5.4 and 3.1(c) interacted regarding the Seconds' voting rights and whether that conduct

"hindered" the Seniors' exercise of rights and remedies with respect to the Common Collateral. Much of the analysis for the Seniors' argument here is exactly the same.

As discussed earlier, because the Seconds were holders of fulcrum securities, they wore the hats of secured creditors *and* unsecured creditors. (*See* Second Transcript A.1246) ("I still think they're the cat in the hat; they're wearing two hats") (Drain, J.). With regards to the ICA, the Seconds were not merely obligated to follow the duties imposed in Section 3.1(c), but were also allowed to enjoy the breadth of rights granted by Section 5.4., which again, provided:

> *Notwithstanding anything to the contrary* in this Agreement, the [Seconds] may exercise rights and remedies *as an unsecured creditor against the Company* or any subsidiary .... Nothing in this Agreement shall prohibit the receipt by any … of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by any [Second] of rights or remedies *as a secured creditor* in respect of Common Collateral

ICA § 5.4 (emphasis added). As a reminder, because this provision starts with "notwithstanding anything to the contrary in this Agreement," the Court found that it trumped every other provision of the ICA. *Int'l Multifoods Corp.*, 309 F.3d 76, 90. At the same time, the Court did not want to read Section 3.1(c) a nullity and believed that if there was an interpretation that would give life to each provision, and align with the case law and the parties' intent, it had to adopt it.

Despite this being a nearly insurmountable task, the Court scanned analogous cases in which other courts had to reconcile two seemingly inconsistent provisions of intercreditor agreements (and similar side agreements) and found that there was only one way to interpret Sections 3.1(c) and 5.4 so as to render the entire agreement workable. This interpretation was that unless the contract provided an *express waiver* or the Seconds' conduct was deemed to have an *obstructionist purpose*, general provisions of the ICA could not be interpreted to contract away rights otherwise vested by federal bankruptcy law.

48

Once again, the Court finds that due to Section 3.1(b)'s inherent tension with Section 5.4,[31] "the exercise of any right or remedy" cannot be interpreted overly broadly for three critical reasons. The first reason—as with Section 3.1(c)—is that, as a matter of law, the broad phrase "in connection with the exercise of any right or remedy" cannot be read to curtail specific rights vested to creditors by the Bankruptcy Code absent an express waiver. *See In re 203 N. LaSalle Street Partnership*, 246 B.R. 325, 331 ("It is generally understood that prebankruptcy agreements do not override contrary provisions of the Bankruptcy Code"); *In re Hart Manufacturing*, 5 B.R. at 736, ("The intent of [the Code] is to allow the consensual and contractual priority of payment to be maintained between creditors among themselves in a bankruptcy proceedings. There is no indication that Congress intended to allow creditors to alter, by a subordination agreement, the bankruptcy laws unrelated to distribution of assets.") (explaining that the Code "guarantees each secured creditor certain rights, regardless of subordination. These rights include the right to assert and prove its claim, the right to seek Court ordered protection for its security, the right to have a stay lifted under proper circumstances, the right to participate in the voting for confirmation or rejection of any plan of reorganization, the right to object to confirmation, and the right to file a plan where applicable.") *In re Boston Generating LLC*, 440 B.R. 302, 319 ("If a secured lender seeks to waive its rights … it must be clear beyond peradventure."). Thus, to the degree that entering restructuring agreements is a bankruptcy right vested to creditors, the Seniors had no business arguing that the Seconds' entrance into the BCA and RSA was contractually prohibited.

The second is that the ICA itself included two qualifying clauses. The first was the "*notwithstanding anything to the contrary*" clause found in Section 5.4, which placed a check on inadvertent waivers by preserving unsecured creditor rights. The second was "*with respect to any*

---

[31] "You have the 3.1 provision and the 5.4 provision. And here, both apply. They both apply. And it just makes no sense. How do you parse through that? To me, that's—it's a crazy contract." (Second Transcript, A.1247) (Drain, J.)

*Common Collateral*," which cabined the rights and remedies provision, implying that even if the Seconds took actions that arguably hindered general remedies the Seniors might otherwise avail, the Seconds could not violate ICA Section 3.1 until they somehow hindered the Seniors' ability to enforce rights *on the Common Collateral*. Here, as discussed earlier, basic economics dictated that the meaning of collateral could not be extrapolated beyond what directly derived from or diminished the tangible collateral. Likewise, the Seconds' conduct must have encroached upon or otherwise diluted the actual Common Collateral before Seniors could plausibly argue that their rights and remedies were infringed with respect to it. This was simply not the case. The Common Collateral remained unscathed.

The third is a matter of principle because we have been dealing with, frankly, a side agreement that initially appeared as an innocuous shield to establish a payment hierarchy that has morphed into a sword to enable the Seniors to work around the Bankruptcy Code. The Court cannot look fondly upon a claim that has been repeatedly pleaded in a conclusory fashion on inconsistent and contradictory theories. All these theories—at their core—attempt to circumvent one of the bedrock functions of bankruptcy law, which is to enable a distressed debtor to reorganize itself. *See LNC Investments*, 247 B.R. at 48 ("For obvious reasons, Congress prefers the successful reorganization of a corporate debtor to liquidation, dismemberment and death"); *In re Kings Terrace Nursing Home and Health Related Facility,* 184 B.R. 200, 203 (S.D.N.Y.1995) ("The object of Chapter 11 of the Code is to permit a potentially viable debtor to restructure and emerge from bankruptcy protection."); *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1354 (9th Cir.1994) (Congress's purpose in enacting Chapter 11 was 'to establish a preference for reorganizations, where they are legally feasible and economically practical.'). "[B]ankruptcy is designed to produce a system of reorganization and distribution different from what would obtain under nonbankruptcy

law, it would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply." *LaSalle,* 246 B.R. at 331.

Entering the RSA and BCA were not just random acts in which the Seconds engaged. They were part of legitimate efforts to reorganize MPM under the Bankruptcy Court's direct supervision, in a manner acceptable in the industry and preferred by Congress.

Lastly, the Court takes a moment to distinguish *Bremer Bank*, No. CIV. 06-1534, 2009 WL 702009 and *Delta Air Lines, Inc.*, 313 F. App'x 430, upon which Appellants repeatedly relied to support their argument that negotiating the terms or restructuring of an aircraft lease constitutes an exercise of "any right or remedy." (Notice of Proposed TAC, A.1013.) The Court has reviewed those cases carefully and finds them to be materially distinguishable from the instant situation. Those cases did not deal with entrance into a financial arrangement like that enabled by the BCA. Rather, both those cases involved *consensual sales* with leveraged lease indemnification provisions. Further, in both those cases, the problematic conduct constituted the creditor's relinquishing their ownership interests in a way that compelled foreclosure on the tangible collateral. *See Bremer Bank*, 2009 WL 702009, at *6). Judge Drain also noted that those cases were more akin to waivers or forbearances than restructuring arrangements. (Second Transcript, A.1292-1320.) Moreover, neither of those cases dealt with an intercreditor agreement with similarly conflicting provisions that necessitated a nuanced linguistic interpretation. As Judge Drain also noted, the Second Circuit did not discredit Judge Hardin's narrow interpretation of the "exercise of rights and remedies," but found that the contract language there was ambiguous *because* Judge Hardin and Judge Scheindlin arrived at opposite interpretations of it. *See In re Delta Air Lines, Inc.*, 313 F. App'x at 434 (2d Cir. 2009). That is not the case here.

Accordingly, the Court affirms the Bankruptcy Court's finding that Appellants did not plead a plausible claim for breach of the ICA based on their receipt of Professional Fees in any iteration of their Complaint. With that, this Court has affirmed all of the Bankruptcy Court's findings on claims related to breaches of the ICA.

### III.     Quasi-Contract Claim

Last, but not least, the Bankruptcy Court also dismissed Appellants' claim brought under the covenant of good faith and fair dealing, finding that it could only survive if there was "a relevant ambiguity in the [ICA] that might give right to such a duty or if the ICA imposes a duty on the defendants although not necessarily expressly states such a duty…." (First Order, A.342).

This Court agrees that the Bankruptcy Court employed the proper standard governing quasi-contract claims in New York because, as a matter of law, they cannot be predicated on the same conduct underlying the breach of contract claims. *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law… does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."). Here, all the duties imposed by the Seniors on the Seconds were imposed through the ICA and the ICA alone. Outside the ICA, the Seconds did not have any obligations to the Seniors, particularly any requiring the Seconds to unequivocally bow down to the Senior's decision-making interests. The Seconds' supposed wrongs were necessarily tethered to provisions in the ICA, which although poorly-drafted and nearly irreconcilable with one another were simply not *ambiguous* regarding the duties and obligations they described. (*See* Second Transcript, A.1249) ("It's not an ambiguity. The provisions are really clear: you can't do this; oh, but you can do this.") (Drain, J.)

Because there was no ambiguity in the linguistic terms of the ICA, nor an implicit duty that the ICA imposed outside the four corners of the contract, the Bankruptcy Court properly dismissed this claim. *See ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'") (citation omitted). Consequently, even if this had Court found that the ICA was fully enforceable and the Seconds defeated its "spirit"—which it has not—the Court would be constrained to claims arising under its actual provisions. *See e.g. Boston Generating,* 440 B.R. at 320. Accordingly, the Bankruptcy Court's ruling on this claim, too, is affirmed.

## CONCLUSION

The Court has reviewed all of Appellants' arguments and finds them to be without merit. Accordingly, the Bankruptcy Court's Orders are affirmed in their entirety. The Clerk of the Court is directed to close the case.

Dated: January 4, 2019                                          SO ORDERED:
      White Plains, New York


                                               _____
                                                NELSON S. ROMÁN
                                       United States District Judge